UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


ROBERT NIEBAUER,              )
          Plaintiff,          )
                              )
          v.                  )   C.A. No. 12-cv-30187-MAP
                              )
CRANE & CO., INC. and         )
CRANE & CO., INC.             )
EXECUTIVE SEVERANCE PLAN,     )
          Defendants.         )


MEMORANDUM AND ORDER RE:
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT
(Dkt. Nos. 32 & 43)

September 15, 2014

PONSOR, U.S.D.J.

I.   INTRODUCTION

Plaintiff Robert Niebauer brings this ERISA suit, 29
U.S.C. § 1132, against Defendants Crane & Co., Inc., and
Crane & Co., Inc. Executive Severance Plan, comprising one
claim for benefits (Count One) against both Defendants and
one claim for interference with benefits (Count Two) against
Defendant Crane & Co.[1]  Defendants have moved for summary

---

[1] "For ease in exposition," the court will simply refer to
"Defendants," even though Count Two is brought only against
Crane & Co.  Colby v. Union Sec. Ins. Co. & Mgmt. Co. for
Merrimack Anesthesia Assocs. Long Term Disability Plan, 705
F.3d 58, 60 (1st Cir. 2013).

judgment, arguing that the decision to deny benefits was not arbitrary or capricious and no evidence suggests that Defendants had any intent to interfere, or did interfere, with Plaintiff's right to benefits.  (Dkt. No. 32.) Plaintiff has opposed that motion and has filed his own cross-motion for summary judgment.  (Dkt. No. 43.)

On the surface, the dispute between the parties centers on whether Plaintiff was fired in December 2011 from his job as Chief Technology Officer at Crane & Co., as Plaintiff avers, or in fact retired from his job, as Defendants aver. As the discussion below will demonstrate, however, it is immaterial which version of the facts is correct.  Because the court finds that, as a matter of law, Defendants' determination that Plaintiff retired -- mistaken or not -- was neither arbitrary nor capricious and that Plaintiff cannot establish intent to interfere with his rights to benefits, the court must allow Defendants' motion and deny Plaintiff's motion for summary judgment.

## II.  FACTS

As mandated per Rule 56, the facts are recited in the light most favorable to the non-moving party.  Fed. R. Civ.

P. 56.  The court will first summarize the severance plan, and then describe the events leading up to Plaintiff's last day of employment.  Finally, the court will turn to Plaintiff's application for the severance benefit and his appeal of Defendants' denial.

A.    The Executive Severance Plan

Defendant Crane & Co. first established Defendant Crane & Co., Inc. Executive Severance Plan in 2007 for the purpose of easing the financial hardships of eligible employees "whose employment [was] terminated involuntarily." (Crane & Co., Inc. Executive Severance Plan 1, § 1.01, Dkt. No. 34, Ex. 3 (hereinafter the "Plan").)  Crane & Co. designated its Compensation Committee as the plan administrator.  Pursuant to Defendants' terms, a "terminated employee" was entitled to severance pay if, <u>inter alia</u>, he was involuntarily terminated from his position at Crane & Co. or left his position for "good reason."  (Plan 4-5, § 3.02.)  The Plan defined "good reason," in part, as the assignment of the employee to duties significantly inconsistent with his position and status, or relocation of the employee's job

location to somewhere not within 75 miles of the previous job location.  (<u>Id.</u> at 3, § 2.16(a) & (b).)

"Terminated employee" was defined as a former employee who experienced an "employment termination date."  (<u>Id.</u> at 4, § 2.26.)  "In no event shall an Employee be considered to have involuntarily terminated employment or to have experienced an Employment Termination Date for the purposes of the Plan if such employment with the Employer is terminated due to [] voluntary cessation of employment (with or without notice) except for Good Reason. . . ."  (<u>Id.</u> at 2, § 2.13.)  Consequently, an executive who quit or retired was not entitled to the severance benefit because he or she did not meet the definition of "terminated employee."

The plan administrator had "full discretionary power and authority to construe, interpret and administer the Plan," as well as to make determinations on benefit eligibility.  (<u>Id.</u> at 8, § 6.01.)  "All decisions, actions and interpretations of the Plan Administrator shall be final, binding and conclusive upon the parties, subject only to determinations by individuals appointed by the Board to review denied claims for Benefits."  (<u>Id.</u> at 9, § 9.01.)

Eligible executives who believed they were entitled to benefits applied by filing a claim form with the plan administrator.  Then, based on the information supplied by the employer, the plan administrator would determine whether the benefit should be paid.  (Id.)  If the benefit claim were denied, the plan administrator would provide a written decision to the employee, specifying the reasons for the decision and the particular Plan provisions upon which the administrator relied.  (Id. at 9, § 9.01 & -.02.)  Additionally, the notice of denial would inform the employee that he had a right to appeal the decision to the plan administrator.

To appeal a denial of benefits, the employee had to file a notice of appeal in writing, "set[ting] forth all of the facts upon which the appeal is based."  (Id. at 10, § 9.02(a).)  In preparing his appeal, the employee was entitled to review those documents relevant to the decision to deny benefits.  (Id.)  Should the plan administrator affirm the initial denial, its decision would be provided in writing to the employee and, again, include the specific

reasons and plan provisions relied on for the decision.
(Id., § 9.02(b).)

B.    Events Leading up to Plaintiff's Departure

Crane & Co. is the exclusive provider of currency paper
to the U.S. Bureau of Engraving and Printing (BEP).
Plaintiff began his career at Crane & Co. in 1979, creating
new paper-making technology for use in Defendants' banknote
and security paper business.  In 2011, Plaintiff was Crane &
Co.'s Chief Technical Officer, reporting to the Chief
Executive Officer (CEO).  He was an eligible employee under
Defendant Executive Severance Plan.

Throughout 2011, Crane & Co. was working with the BEP
on paper for the new $100 banknote.  The production and use
of the new paper encountered printing complications.  In
October 2011, Crane & Co. replaced its former CEO, Charlie
Kittredge, with Stephen DeFalco, whose first order of
business was addressing the ongoing difficulties with the
BEP contract.  DeFalco created a task force, called Project
Momentum, to address the problems, and he staffed it with
technical specialists responsible for repairing both the
paper problem and the frayed relationship with the BEP.

(DeFalco Dep. 68:1-21, Dkt. No. 34, Ex. 2.) DeFalco designated Rich Rowe as the head of the Project Momentum working group. At the time, Rowe was the manager of Crane & Co.'s New Hampshire facility and in that capacity reported to an executive at least two levels below the CEO. (Id. at 70:15-21.) As head of Project Momentum, Rowe reported to a steering committee put together by DeFalco to oversee the task force. (Id. at 70:6-24 - 71:1-13.)

On November 18, 2011, DeFalco asked Plaintiff to be the "boots on the ground" company representative at the BEP facility in Texas. In his role as liaison on the Project Momentum team, Plaintiff was to report to Rich Rowe. Plaintiff agreed, and DeFalco sent out an announcement to the BEP of the assignment later that day. (DeFalco Dep. Ex. 48, Dkt. No. 47, Ex. 5 at 44.) Although it would not surface until after the announcement was released, Plaintiff and DeFalco had different conceptions about the duration of Plaintiff's liaison assignment. (Id.) Plaintiff thought he would be in Texas until the end of 2011; DeFalco expected the assignment in Texas to last until March 2012. (Id.)

On November 22, 2011, Plaintiff and DeFalco had a telephone conversation, the content and spirit of which they dispute. Plaintiff contends that he informed DeFalco of his concerns regarding the project and the length of time he was required to be in Texas. He also expressed his belief that the conditions of the assignment constituted "good reason" under the Plan for him to cease his employment, thus entitling him to severance if he decided to leave. In particular, Plaintiff concluded that reporting to Rowe, rather than the CEO, constituted a "substantial adverse alteration in the nature or status" of his employment under § 2.16(a) of the Plan. (Plan 3, § 2.16(a).)

Plaintiff proposed that he would nonetheless take the Texas assignment if DeFalco were to commit to paying Plaintiff severance if he postponed leaving until the end of the project. DeFalco responded that severance was for fired employees only, that he was not firing him, and that he wanted Plaintiff on the task force. When Plaintiff then posited that refusing the assignment would get him fired and then entitle him to severance, DeFalco retorted that, if

Plaintiff were fired for insubordination for not taking the assignment, he would not be eligible for severance.

DeFalco believed that the exchange was an attempt by Plaintiff to use his favored relationship with the BEP to extract extra compensation (i.e., a promise of severance pay for which he was not eligible if he voluntarily retired) in return for his commitment to Project Momentum. (DeFalco Dep. 134:5-11, Dkt. No. 34, Ex. 2.) In his conversation with DeFalco, Plaintiff stated that he was in a position of "maximum leverage." (Niebauer Dep. 99:17-24, Dkt. No. 34, Ex. 5.) Nevertheless, at the end of the conversation, according to both Plaintiff and DeFalco, Plaintiff again agreed to the Texas assignment, with full knowledge of the longer time commitment.

As Project Momentum moved forward, several meetings were scheduled at the beginning of December, some in Texas and some in western Massachusetts. A meeting in Fort Worth, Texas was scheduled for December 5 and 6, 2011 (a Monday and Tuesday). As the BEP liaison, Plaintiff was expected to attend the meetings. (Niebauer Dep. 25:7-22, Dkt. No. 34, Ex. 5.) On Sunday morning, December 4, 2011, Plaintiff sent

an email to Rowe concerning Plaintiff's unwillingness to travel to Texas and ended the email stating, "I have made some decisions I must inform you of." (Niebauer Dep. Ex. 70, Dkt. No. 34, Ex. 5.) Later that morning, Plaintiff also sent DeFalco an email requesting a phone conversation to discuss "a decision [Plaintiff had] reached." (Exhibit K 3 (CRA 637), Dkt. No. 34, Ex. 12.) They agreed to talk at 3:00 p.m. the following day. Additionally, Plaintiff sent another email definitively stating that he was not able to make the trip to Texas and would not be present at the following day's meetings. (Niebauer Dep. Ex. 72 , Dkt. No. 34, Ex. 5.)

On December 5, 2011, Plaintiff and DeFalco had another conversation, this time by cell-phone. The substance of this call is, again, hotly contested by the parties. The call was complicated by the fact that the cell service cut out once, resulting in an interruption in their conversation. Plaintiff asserts that he intended to convey to DeFalco his grave concerns about the composition of the project team and his sentiment that he (Plaintiff) had no other option but to retire unless his concerns were

addressed.  (Niebauer Dep. 109:5-8 ("I think I said words to
the effect that since I wasn't able to negotiate the
severance, the only option that you are leaving me, Stephen,
is to consider retiring.  Something like that."), Dkt. No.
34, Ex. 5.)  Plaintiff states that, after the interruption
due to the suspended cell service, he called back and
DeFalco said that he never tried to talk an executive out of
retiring and that Plaintiff should keep the conversation to
himself and await a call from James Hackett, the company's
general counsel, and James Wickliff, head of Human Resources
(HR).  Plaintiff's argument now is that, despite his
references to retiring, he did not intend to retire as of
the time of the phone call.  Defendants maintain that
Plaintiff informed DeFalco that, effective immediately,
Plaintiff was retiring, in part because he was not going to
receive severance pay for signing on to Project Momentum.
(DeFalco Dep. 165:21-24 ("He said, 'If you're not going to
let me have my severance at the end of the Project Momentum,
then I'm just going to retire now effective immediately.'"),
Dkt. No. 34, Ex. 2.)

Despite this disagreement, no dispute exists that DeFalco <u>believed</u> that Plaintiff had announced his intention to retire.[2] (Defs.' Statement of Material Facts in Supp. ¶ 4, Dkt. No. 34; Pl.'s Statement of Material Facts in Opp'n ¶ 29, Dkt. No. 46.) While Plaintiff contends that DeFalco's impression was actually a misunderstanding of what Plaintiff had been saying, he does not dispute that DeFalco (perhaps unreasonably, but certainly sincerely) left that conversation thinking that Plaintiff wanted to retire. (Niebauer Aff. ¶ 15, Dkt. No. 45.)

Shortly after their conversation on December 5th, Plaintiff forwarded an email to DeFalco from the BEP clients asking to set up a time to talk with Plaintiff. Plaintiff asked how he should respond to the inquiry, adding that he "would like this to be a smooth transition." (Ex. M (CRA 630), Dkt. No. 34, Ex 14.) The reference to "transition"

---

[2] Which parties' version of the phone conversation is actually the truth is of no consequence. As discussed by the court below, it matters not whether the plan administrator was actually correct in its finding that Plaintiff was not fired but had retired; it matters only that its decision was "reasoned and supported by substantial evidence in the record," even if there is evidence supporting a contrary finding. <u>Cusson v. Liberty Life Assur. Co. of Boston</u>, 592 F.3d 215, 230 (1st Cir. 2010) (internal quotations omitted).

evidences, at a minimum, Plaintiff's impression that his tenure with his employer was coming to an end.  Plaintiff then forwarded the emails to his wife, Gretchen.  Later that day, Plaintiff received a reply from his wife, in which she stated, "Sounds like you told [DeFalco] that retirement is [the] route."  (Eilers Dep. Ex. 61 (CRA 029), Dkt. No. 34, Ex. 7.)

The following morning, December 6, 2011, Plaintiff returned to work at his office at Crane & Co. and began sorting through his things.  (Eilers Dep. Ex. 61 (CRA 132) (stating in an email that Plaintiff "spent the afternoon cleaning up [his] office and throwing out a lot of stuff that used to mean a lot to [him] but going forward have little value"), Dkt. No. 34, Ex. 7.)  When asked by a co-worker whether he decided to leave, Plaintiff replied that he had "been asked not to tell anyone."  (Id. (CRA 030-31).)[3]  Later that morning, Plaintiff wrote to his daughter telling her that he informed his boss that he did not want

---

[3] At 3:00 p.m. on December 6, DeFalco sent out an announcement regarding the Project Momentum team, and Plaintiff was not listed among the team members.  Plaintiff then sent an email to his colleague stating, "Guess I can tell people now...." (Eilers Dep. Ex. 61 (CRA 124), Dkt. No. 34, Ex. 7.)

to move to Texas and that he "want[ed] to retire."[4]
(Niebauer Dep. Ex. 74 (CRA 612), Dkt. No. 34, Ex. 5.)  He
also wrote his wife that they could "kiss the severance
option good bye," as the only way to get severance was to
have negotiated it with DeFalco.  (Eilers Dep. Ex. 61 (CRA
032), Dkt. No. 34, Ex. 7.)

     Also on December 6, 2011, Plaintiff met with Wickliff,
the head of HR, to discuss when Plaintiff's last day at work
would be, as his retirement payouts would depend on this
determination.  Wickliff wrote DeFalco that Plaintiff
confirmed that morning "his decision to retire," though
Plaintiff was uncertain about his end date.  (Wickliff Dep.
Ex. 4 (CRA 226), Dkt. No. 34, Ex. 3.)  Complicating the
matter was Plaintiff's accrued vacation time for 2011, as
well as vacation time he would become entitled to on January
1, 2012.  Wickliff advised Plaintiff that he could exit the
following day, December 7, 2011, and use his vacation time

---

[4] Plaintiff stated in his deposition that he "lied" to his
daughter in the email because he was embarrassed to say he had
been fired.  (Niebauer Aff. ¶ 32, Dkt. No. 45.)  Plaintiff
also objects to any consideration of this email on the ground
that it was not before the plan administrator when it made its
decision.  The email is not essential to the court's ruling.

up to an official retirement date of February 1 or March 1, 2012.  (Id.)  Plaintiff confirmed this understanding in another email to a colleague, in which Plaintiff stated that his last day of work would be the following day, December 7, followed by eight weeks of paid vacation, with an official retirement day of February 1, 2012.  (Eilers Dep. Ex. 61 (CRA 123), Dkt. No. 34, Ex. 7.)

In the late afternoon and evening of December 6, Plaintiff and DeFalco continued to send separate emails to people at Crane & Co. about Plaintiff's decision to retire. The word "retire" or "retirement" occurred regularly in both their communications.  Plaintiff, for example, sent an email to Rowe, asking him if he was aware of Plaintiff's "pending retirement."  (Niebauer Dep. Ex. 73 (CRA 561), Dkt. No. 34, Ex. 5.)  Meanwhile, DeFalco sent an email to members of Crane & Co.'s board of directors announcing Plaintiff's retirement and discussing how to fill Plaintiff's vacancy on Project Momentum.  (Ex. L (CRA 214), Dkt. No. 34, Ex. 13.)

In the following days, both Plaintiff and Defendants continued to discuss Plaintiff's decision to retire.[5] Plaintiff continued his discussions with HR regarding what his retirement date would be.  In an email on December 8, 2011, to Richard Kendall, who handled retirement calculations for Defendants' executives, Plaintiff wrote that the February 1, 2012, retirement date would work. (Eilers Dep. Ex. 61 (CRA 037), Dkt. No. 34, Ex. 7.)  The following day, Kendall had a conversation with Plaintiff about retirement calculations.  Plaintiff asked if getting the retirement calculations meant he had to retire, to which Kendall responded that it did not.  (Ex. I (CRA 1493), Dkt. No. 47, Ex. 9.)  Nonetheless, in that same conversation, Kendall confirmed that, for a March 1, 2012, retirement date, Plaintiff's last day at work would be January 27, 2012, followed by five weeks of vacation.  (Ex. I (CRA 1493-94), Dkt. No. 47, Ex. 9.)

_____

[5] Plaintiff avers that he "was retired" by DeFalco in the December 5, 2011, phone conversation and maintains that he characterized the conversation this way in his conversations with friends and family from the outset. (Niebauer Aff. ¶¶ 16 & 17, Dkt. No. 45.)  Nonetheless, it is clear from the record that Plaintiff, at a minimum, kept up the appearance of having made the choice to retire in a number of contexts.

Sometime around December 12, 2011, the record reveals that Plaintiff changed his characterization of his impending departure from Crane & Co.[6]  Up to then, Plaintiff had regularly portrayed his retirement as his own decision. However, after December 12 he abandoned that position and began asserting either that he was merely contemplating retirement, or that DeFalco had forced retirement on him (See Niebauer Aff. ¶ 25, Dkt. No. 45.)  For example, on December 13, 2011, Plaintiff replied to an email congratulating him on his retirement from Christopher Duquette, a co-worker, saying he had only "agreed to consider retirement and look at the numbers to see if it is possible."[7]  (Hackett Dep. Vol. I Ex. 40 (CRA 436), Dkt. No. 34, Ex. 6.)  Around the same time, Plaintiff had another conversation with Wickliff during which he indicated that he had changed his mind about retirement.  Wickliff replied that, from DeFalco's viewpoint, Plaintiff resigned and that

---

[6]  As noted, Plaintiff maintains, contrary to the record, that he consistently told friends and family that DeFalco "retired him."  (Niebauer Aff. ¶¶ 16 & 24, Dkt. No. 45.)

[7]  This email was not provided to the Compensation Committee for its benefits decision.

if Plaintiff wanted his job back he needed to ask DeFalco. (Wickliff Dep. 144:1-13, Dkt. No. 47, Ex. 1; Wickliff Dep. 145:2-11, Dkt. No. 34, Ex. 3.) Wickliff summarized this conversation to DeFalco in an email. (Wickliff Dep. Ex. 9 (CRA 197), Dkt. No. 47, Ex. 1.)

On December 16, 2011, DeFalco called Plaintiff and told him his last day at work was that day. (DeFalco Dep. 204:21-24, Dkt. No. 34, Ex. 2; Wickliff Dep. 162:13-17, Dkt. No. 47, Ex. 1.) In response to the phone conversation, Plaintiff sent DeFalco an email, now stating unequivocally that he had not resigned from Crane & Co. (DeFalco Dep. Ex. 59 (CRA 021), Dkt. No. 34, Ex. 2.) Moreover, Plaintiff stated that he regarded "the termination of [his] employment . . . [as] involuntary under the Executive Severance Plan." (Id.) Plaintiff later received a letter from Wickliff, dated December 16, 2011, congratulating Plaintiff on his retirement and recognizing December 16 as his last with the company. (Wickliff Dep. Ex. 11 (CRA 163), Dkt. No. 47, Ex. 1.) Wickliff informed Plaintiff that, though his "last working day" was December 16, he would continue on the payroll until January 31, 2012. (Id.)

18

As of December 16, Crane & Co. shut down Plaintiff's
email and voicemail.  When Plaintiff submitted documents to
HR to process his benefits, he included a letter to HR
stating that he did not intend the submissions to be taken
as a concession that he retired; he continued to insist that
he had been terminated.  The HR database coded Plaintiff's
status as "Retirement - Involuntary."[8]  (Ex. L (CRA 176),
Dkt. No. 47, Ex. 12.)  After analyzing the situation, HR
determined that Plaintiff's departure did not trigger the
severance option under the Plan.  (Hackett Dep. Vol. I
115:14-21, Dkt. No. 34, Ex. 6.)  Plaintiff's position at
Crane & Co. was eliminated upon his departure.  (Wickliff
Dep. 226:6-10, Dkt. No. 47, Ex. 1.)

C.  Plaintiff's Application and Appeal

On February 2, 2012, Plaintiff submitted a claim for
severance benefits, totaling $855,920.00, to the plan
administrator, Crane & Co.'s Compensation Committee.
(Wickliff Dep. Ex. 6 (CRA 020), Dkt. No. 34, Ex. 3.; Pl.'s
Initial Disclosures 7, Ex. R, Dkt. No. 34, Ex. 19.)  It was

_____

[8] Defendants maintain that this was merely a designation made
by an HR technical employee trying to accurately catalog
Plaintiff's letter.

19

clear at that time that there existed a dispute about the events leading to Plaintiff's separation from the company and his entitlement to severance under the Plan. (Hackett Dep. Vol. I 114:1-4, Dkt. No. 34, Ex. 6.) James Hackett, Crane & Co.'s in-house counsel, contacted the chair of the board of directors, Frank Kittredge, about Plaintiff's application. Thereafter, Hackett conducted an investigation into Plaintiff's claim for purposes of presenting the case to the plan administrator. (Id. at 117:5-24 – 118:1-6.) Hackett stated that he gathered information and compiled documents for the plan administrator's review with a mind towards its fiduciary duty to get the relevant facts and look into Plaintiff's claim in good faith. (Id. at 128:12-20.)

Hackett summarized the results of his investigation in a one-page document titled "Timeline–Bob Niebauer Departure." (Wickliff Dep. Ex. 15 (CRA 022), Dkt. No. 34, Ex. 3.) The timeline did not incorporate Plaintiff's version of events, but rather reflected what Hackett determined was DeFalco's and the company's account. (Hackett Dep. Vol. I 146:7-21, Dkt. No. 34, Ex. 6.) The

timeline included Plaintiff's conversation with DeFalco on November 22, 2011, and described Plaintiff as stating he had "maximum leverage" to negotiate a severance payout at the end of Project Momentum. (Wickliff Dep. Ex. 15 (CRA 022), Dkt. No. 34, Ex. 3.) The timeline listed December 5, 2011, as the date Plaintiff announced his decision to retire to DeFalco, and it cited five emails sent between December 5 and December 8, 2011, in which Plaintiff talked about his retirement and ackowledged that he was not entitled to severance. (Id.) Furthermore, the timeline designated December 16, 2011, as the date of the phone call between Plaintiff and DeFalco in which Plaintiff claimed that he did not actually retire. This was also the date the company sent Plaintiff a letter confirming his retirement. (Id.)

The Compensation Committee, as the plan administrator, met on March 15, 2012, to consider Plaintiff's severance application, as well as to consider another issue, how to pay out Plaintiff's Management Incentive Compensation (MIC). Prior to the meeting, Hackett provided to the committee a number of documents: a copy of the Plan; Plaintiff's application for benefits with his December 16, 2011, letter

to DeFalco attached; a copy of the timeline of events, prepared by Hackett, that reflected DeFalco's version of events; and emails from Plaintiff in which he referred to his retirement from Crane & Co. (Hackett Dep. Vol. I 160:5-14, Dkt. No. 34, Ex. 6; Wickliff Dep. Ex. 17 (CRA 042), Dkt. No. 34, Ex. 3.) The committee first addressed the MIC payout. The plan called for a lump sum payout, unless the executive elected a ten-year payout. The form Plaintiff submitted for election appeared to select the ten-year option, but it was unsigned. The committee concluded that, given the confusion, it would rule in Plaintiff's favor and permit the MIC payment to be an immediate lump sum payout of $3.5 million. (Eilers Dep. 66: 21-24 – 67:1-12, Dkt. No. 34, Ex. 7.; Mgmt. Dev. & Comp. Comm. Minutes Mar. 15, 2012 (CRA 039), Eilers Dep. Ex. 61, Dkt. No. 34, Ex. 7.; Niebauer Dep. 111:3, Dkt. No. 34, Ex. 5.)

Moving on, the committee began the severance discussion with Hackett presenting the terms of the Plan and describing the plan administrator's duties. (Eilers Dep. 69:15-21, Dkt. No. 34, Ex. 7.) Hackett then presented the results of his investigation into Plaintiff's departure. (Application

of Robert J. Niebauer for Benefits Pursuant to Crane & Co.'s Executive Severance Plan 2 (CRA 042), Wickliff Dep. Ex. 17, Dkt. No. 34, Ex. 3.)  DeFalco, Wickliff, and Charlie Kittredge also spoke to the committee.  (Id.)  After examining the issue for about 30 minutes, the committee decided to deny Plaintiff's application, stating: "The conclusion was that [Plaintiff], a valued senior executive, had voluntarily elected to resign his employment, and that therefore he was not eligible for a severance benefit pursuant to the Plan."  (Id. (CRA 043).)

On June 28, 2012, Plaintiff filed a voluminous appeal, with supporting documents, describing his version of events. In essence, Plaintiff took the position that the December 5 phone call had resulted in a miscommunication about his intent to retire: "[T]he Company's temporary belief that I wished to resign was based on a misunderstanding and [] once the misunderstanding became clear to me, I cleared up the misunderstanding and made clear my desire to continue my long and fruitful career at the Company."  (Appeal of Notice of Severance Benefit Denial 2 (CRA 046), Kittredge Dep. Ex. 26, Dkt. No. 34, Ex 4 (hereinafter "Appeal").)  By

Plaintiff's account, he described himself as feeling "stunned and disoriented" and like his "head was still spinning" from his December 5 conversation with DeFalco. (Appeal 15 & 16 (CRA 059 & 060).)  Moreover, he immediately believed that he had been "retired" by DeFalco and shared that conviction as soon as the following day with Wickliff. (Appeal 15 (CRA 059).)

Plaintiff's appeal included a point-by-point refutation of the timeline prepared by Hackett for the Compensation Committee.  Plaintiff does not dispute the authenticity of any of the emails supporting Hackett's timeline; he simply provides alternate contexts to explain their content.  For example, to explain his numerous conversations with Kendall and Wickliff about setting a retirement date and figuring out pension payout calculations, Plaintiff stated that he was merely exploring his various options for an eventual, but not imminent, retirement.  (Appeal 16-18 (CRA 060-62).) Additionally, the email he sent setting his retirement date as February 1, 2012, "was intended only for Mr. Kendall." (Appeal 17 (CRA 061).)

In sum, Plaintiff's appeal presented his view of
DeFalco's misunderstanding of the December 5 phone call, why
Plaintiff considered himself to have been "retired" by
DeFalco, as well as why the evidence relied on by the
Compensation Committee in denying his application for
severance did not actually support its decision.  Plaintiff
stated that he found it "unprecedented that a 'retiring'
executive would be told his 'last day'" by the CEO instead
of selecting that date on his own.  (Appeal 21 (CRA 065).)
He cited the retirement of another employee, Tim Crane,
several months later as a prototypical example of how a
retirement from Crane & Co. occurred: the executive's
impending retirement was announced several months before
that executive's chosen last day.  (Appeal 24 (CRA 068).)
Finally, Plaintiff pointed out that, when the Massachusetts
Department of Unemployment Assistance (DUA) awarded
Plaintiff unemployment benefits, Crane & Co. did not appeal
the award, despite contesting Plaintiff's application at the
hearing.  (Appeal 25 (CRA 069).)

The Compensation Committee scheduled a special meeting
for August 24, 2012.  In advance of the meeting, the

committee members were provided with additional materials, including Plaintiff's appeal, emails made available to Plaintiff but not referenced by him in his appeal, and an explanation of some arbitration cases and the DUA award referenced by Plaintiff.  On the morning of August 24, 2012, the Compensation Committee convened, by telephone conference, to review Plaintiff's appeal.  DeFalco again reviewed the events.

After reviewing Plaintiff's materials and hearing from DeFalco and Hackett, the committee came to the conclusion that, though it was clear that Plaintiff believed that there had been a miscommunication on the December 5 call, the evidence amply supported the conclusion that Plaintiff had retired, particularly since he never requested to be reinstated.[9]  (Eilers Dep. Vol. I 118:1-18, Dkt. No. 34, Ex 7.)  Following a 45-minute discussion, the committee unanimously voted to deny Plaintiff's appeal.  (Record of

---

[9]  As for Plaintiff's assertion that Defendants chose his end date, Mr. Eilers stated in his deposition that the committee considered the choice of that last day of work (December 16, 2011) as "an administrative detail" not relevant to the question of whether Plaintiff had decided to retire.  (Eilers Dep. 161:3-11, Dkt. No. 52, Ex. 2.)

the Meeting of the Comp. Comm. (CRA 135), Kittredge Dep. Ex. 28, Dkt. No. 34, Ex 4.)  They sent a notice of their decision to Plaintiff stating:

> After considering and discussing the information presented, the Committee concluded that [Plaintiff] had in fact elected to resign his employment rather than continue to work in support of the Crane & Co. project to which he had been assigned and further that his resignation was not for good reason as that term is described in the Severance Plan.  See Article 2, Section 2.10 and 2.16. . . . [Plaintiff's] appeal and request for Severance Benefits is denied.  This decision is final and not subject to further appeal per the terms of the Plan (Article 9, Section 9.02).

(Mem. Summarizing Decision 2 (CRA 134), Kittredge Dep. Ex. 29, Dkt. No. 34, Ex 4.)

On October 30, 2012, Plaintiff filed suit against Defendants seeking to recover severance, health insurance, and other benefits under the Plan.  As noted, the complaint offers two counts, one for denial of benefits pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B), and one against Defendant Crane & Co. alone for interference with protected rights pursuant to ERISA, 29 U.S.C. § 1132(a)(3).  The parties' cross motions for summary judgment are now before the court.

### III.  DISCUSSION

If there is no genuine dispute as to material facts and the movant is entitled to judgment as a matter of law, the court must grant summary judgment. Fed. R. Civ. P. 56(a); Bonneau v. Plumbers & Pipefitters Local Union 51 Pension Trust Fund, 736 F.3d 33, 36 (1st Cir. 2013). Where, as here, both parties have moved for summary judgment, "the court must consider each motion separately, drawing inferences against each movant in turn." Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

Both parties have moved for summary judgment on all counts. Ultimately, the court will rule in Defendants' favor, as their decision was not arbitrary and capricious and no evidence supports the theory that they acted with the purpose of interfering with Plaintiff's rights to ERISA benefits. The discussion below will examine the parties' arguments concerning each count in turn.

A.   Count One – Denial of Benefits

Plaintiff asserts that the plan administrator's decision was compromised by three factors: first, a conflict of interest; second, procedural irregularities; and, third, substantive flaws. Meanwhile, Defendants point out that if

28

the decision is "reasoned and supported by substantial evidence in the record," the court must uphold it, even if there is evidence supporting a contrary finding.  <u>Cusson v. Liberty Life Assur. Co. of Boston</u>, 592 F.3d 215, 230 (1st Cir. 2010) (internal quotations omitted).

Preliminarily, Defendants and Plaintiff dispute the standard of review the court should employ in evaluating the plan administrator's decision.  This issue must be addressed before the discussion turns to the parties' substantive arguments.

### 1.  <u>Standard of Review</u>

Where an ERISA plan vests the administrator with the discretion to determine eligibility for benefits, "a reviewing court must uphold that decision unless it is arbitrary, capricious, or an abuse of discretion."  <u>Cusson</u>, 592 F.3d at 224 (internal quotations omitted).  In other words, the court's review is deferential.  <u>Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan</u>, 705 F.3d 58, 61 (1st Cir. 2013).  Essentially, the court assesses whether "a plan administrator's determination is plausible in light of the

record as a whole, or, put another way, whether the decision is supported by substantial evidence in the record." Id. (internal quotations omitted).  The parties agree that the plan at issue here grants the plan administrator such discretionary power.

Nonetheless, Plaintiff asserts that the deferential standard of review is circumscribed in this case.  He argues that, because the plan at issue is a "top-hat" plan, the standard of review is de novo.  See McCarthy v. Commerce Grp., Inc., 831 F. Supp. 2d 459, 479-80 (D. Mass. 2011) (Saris, J.) (stating that there is a split among the circuits on whether administrator decisions for "top-hat" plans are reviewed under the traditional arbitrary or capricious standard or de novo review and recognizing that the First Circuit has not yet weighed in on the dispute). Top-hat plans are defined as those plans "maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees."  29 U.S.C. § 1051(2).  It is undisputed that the Plan here is a top-hat plan.

Defendants do dispute, however, Plaintiff's contention that anything less than a deferential standard should apply here. The First Circuit has held that where a determination pursuant to an ERISA plan requires the administrator to interpret non-plan documents, then the review standard is de novo. Hannington v. Sun Life & Health Ins. Co., 711 F.3d 226, 230-31 (1st Cir. 2013). Otherwise, the usual deferential standard of review applies. Id. Since the administrator here did not interpret any non-plan documents, a simple application of Hannington requires this court to apply the arbitrary or capricious standard of review.[10] Colby, 705 F.3d at 61. Thus, the court's review of the plan administrator's decision is more akin to that of an

---

[10] In McCarthy, Judge Saris concluded that the standard of review appropriate for top-hat plans was "deferential so long as the plan administrator acted reasonably and in good faith." McCarthy, 831 F. Supp. 2d at 480. Almost two years later, the First Circuit issued the Hannington decision in which it found that the de novo standard of review applied only where the plan administrator reviewed non-plan documents. Though the Hannington case did not address top-hat plans specifically, the court will apply the law as set forth in that case. However, it is worth noting that, with respect to any difference between the Hannington decision and Judge Saris' earlier decision in McCarthy, "the debate over the standard of review is much ado about not much." Id. Even applying the McCarthy standard of "reasonableness and good faith," the decision in this case would be the same.

appellate, rather than a trial, court.  <u>Cusson</u>, 592 F.3d at
224.

   2.   <u>Conflict of Interest</u>

   An additional issue respecting the degree of the
court's scrutiny is the potential existence of a conflict of
interest.  A conflict of interest is not a determinative
factor on its own: it is one of many relevant factors that,
together, the court must weigh in deciding whether to set
aside a plan administrator's judgment.  <u>Id.</u>  "In other
words, where the plan documents delegate discretionary
authority to the plan administrator (whether or not
structurally conflicted), courts should review benefit-
denial decisions for abuse of discretion, considering any
conflict as one of a myriad of relevant factors."  <u>Denmark
v. Liberty Life Assur. Co. of Boston</u>, 566 F.3d 1, 9 (1st
Cir. 2009).

   For the court to consider a conflict, a plaintiff must
show that the conflict of interest influenced the
defendant's decision.  <u>Cusson</u>, 592 F.3d at 225.
Specifically, a plaintiff must point to evidence showing how
the plan administrator's structural or actual conflict of

interest affected the defendant's decision.  Where a
plaintiff can make such a showing, "the conflict itself can,
under certain circumstances, be accorded extra weight in the
court's analysis."  Id. at 224.

Plaintiff alleges that two conflicts of interest
justify a more skeptical analysis of the decision at issue
here.  Id. at 224-25 (stating that the presence of a
conflict of interest is a factor to consider in evaluating
the adequacy of the administrator's process).  First,
according to Plaintiff, a structural conflict existed since
the plan administrator both made the benefit decisions and
paid out the benefits.  In cases where a structural conflict
exists, the reviewing court must evaluate the possible
influence of the conflict upon the benefits decision.
Denmark, 566 F.3d at 8 (discussing Metro. Life Ins. Co. v.
Glann, 554 U.S. 105 (2008)).  Courts are "duty-bound to
inquire into what steps a plan administrator has taken to
insulate the decisionmaking process against the potentially
pernicious effects of structural conflicts."  Id. at 9.

Second, Plaintiff argues that, in addition to a
structural conflict, there is an actual conflict of interest

because the Compensation Committee's decision was infected by its concern about the defects in Project Momentum and the company's relationship with the BEP. See id. at 6 (defining an actual conflict as one where "the plan administrator's decision is shown to be conflict-driven").

Defendants counter that Plaintiff has failed to proffer sufficient evidence that any potential conflict of interest, structural or actual, influenced the committee's decision. Id. Though they acknowledge the existence of a structural conflict of interest, they characterize it as "de minimis." (Defs.' Mem. of Law in Supp. 15, Dkt. No. 33.) Further, Defendants assert that there is no evidence that the conflict affected the integrity of the process.

Defendants have the better argument. Though Plaintiff generally identifies the existence of a structural conflict of interest, he fails to address how Defendants' internal procedures, or lack of safeguards, affected the review process. See Cusson, 592 F.3d at 225. In the end, the

suggestion that a structural conflict warped the decision-making process in some way is purely conjectural.[11]

Similarly, Plaintiff's arguments regarding the existence of an actual conflict are not supported by the record.  As a threshold matter, the argument that the benefit decision was somehow tainted by Defendants' concern over Project Momentum is rather hard to follow.  Plaintiff seems to suggest that his absence was going to damage the Project and that Defendants wanted to penalize him because they were angry at his decision to leave the company at a sensitive time.  Plaintiff also strongly contends, however, that he never decided to leave, that Defendants knew he wanted to continue his employment, and that they nevertheless arbitrarily terminated him involuntarily, apparently despite the negative impact on the Project.

---

[11]  It is worth noting that positive evidence of the administrator's good faith appears in the record. Immediately before addressing Plaintiff's initial application for benefits, the plan administrator awarded Plaintiff a lump sum payment of his MIC benefit -- an entitlement worth over three times as much as the potential payout to Plaintiff under the severance plan -- despite the fact that the paperwork submitted by Plaintiff appeared to be inadequate.

In any event, even were the court to accept Plaintiff's suggestion that something about Project Momentum created a potential conflict of interest, no evidence in the record demonstrates how this purported conflict affected the benefits decision.  Other than a general concern about how Project Momentum was progressing, there is no evidence connecting the Project to Defendants' severance decision. The facts here are in strong contrast to those found in McCarthy, 831 F. Supp. 2d at 488, where the court concluded that the plan administrator was improperly influenced to deny the plaintiff's claim because a favorable decision might have left the company exposed to claims for more than $100 million in additional plan payouts.

In sum, the existence of a conflict, structural or actual, plays no significant role in the analysis here.  The court need do no more than "consider it along with all of the factors present in this case to determine if [Defendants'] ultimate conclusion" was an abuse of discretion.  Cusson, 592 F.3d at 228.

    3.    Procedural Flaws

In evaluating the plan administrator's decision, the court looks to both the procedural integrity of the decision-making and to whether the decision itself is substantively valid. "[P]rocedural irregularities constitute an abuse of discretion when they are 'serious,' have a 'connection to the substantive decision reached, and call into question the integrity of the benefits-denial decision itself.'" McCarthy, 831 F. Supp. 2d at 480. Substantively, if a decision is reasoned and supported by evidence that is "reasonably sufficient to support a conclusion," then the court must uphold the decision. Cusson, 592 F.3d at 230. Even if there is evidence before the plan administrator that could support a contrary decision, the court must nonetheless find the decision reasonable where there is substantial evidence supporting it. Id.

Plaintiff presents two attacks on the procedural integrity of Defendants' decision: first, Defendants did not comply with the § 503 notice requirements of ERISA, and, second, the facts were not adequately presented to the Compensation Committee. Defendants argue that Plaintiff

received a fair review of his claim for benefits as well as
of his appeal and that the plan administrator can properly
rely on an employer's representations in deciding a benefits
application.

> ERISA requires that every plan:
>
> shall (1) provide adequate notice in writing to
> any participant or beneficiary whose claim for
> benefits under the plan has been denied, setting
> forth the specific reasons for such denial, . . .,
> and (2) afford a reasonable opportunity to any
> participant whose claim for benefits has been
> denied for a full and fair review by the
> appropriate named fiduciary of the decision
> denying the claim.

29 U.S.C. § 1133.  Though the plan must give specific
reasons, "it need not provide the 'reasoning behind the
reasons' or [the] 'interpretive process that generated
reason for denial.'"  McCarthy, 831 F. Supp. 2d at 483.  The
purpose of these requirements is, in part, to provide
claimants with the information necessary to permit them to
pursue their rights under the plan and the law, Recupero v.
New Eng. Tel. & Tel. Co., 118 F.3d 820, 840 (1st Cir. 1997),
and to promote a "meaningful dialogue" between the claimants
and the plan administrators with the goal of resolving

disputes without engaging the court system, McCarthy, 831
F. Supp. 2d at 484.

The notice requirements of ERISA do not, however,
"create a system of strict liability for formal notice
failures." Terry v. Bayer Corp., 145 F.3d 28, 39 (1st Cir.
1998). A plaintiff claiming a violation of the notice
requirements must proffer evidence that the inadequate
notice prejudiced him or her in a way that affected the plan
administrator's decision. Compare Recupero, 118 F.3d at 840
(stating that the plaintiff must make some "showing that a
precisely correct form of notice would have made a
difference"); and Terry, 145 F.3d at 39 (finding that the
plaintiff failed to demonstrate prejudice stemming from the
defendant's notice defect); with McCarthy, 831 F. Supp. 2d
at 488 (finding that the plaintiff had made the requisite
showing that the flawed notice, among other procedural
flaws, prejudiced the review of her claim). If the evidence
shows that, despite the defective notice, the claimant
received "a full and fair review" by the plan administrator,
as required under § 1133(2), the court will not allow a

claim for relief based solely on that basis.  <u>Terry</u>, 145
F.3d at 39.

Under ERISA's regulations, a full and fair review by a
plan administrator comprises a minimum 60-day appeals
process, the opportunity for the claimant to submit
additional evidence, reasonable access to all relevant
documents, and a thorough review of the evidence, whether
newly presented or previously examined.  29 C.F.R. §
2560.503-1(h)(2)(i-iv); <u>McCarthy</u>, 831 F. Supp. 2d at 482.  A
court may set aside the plan administrator's decision if it
failed to provide a "full and fair review" by, for example,
relying on a biased investigation either that was "designed
not to find the truth but to assemble facts that will
support a denial of benefits," <u>McCarthy</u>, 831 F. Supp. 2d at
486, or that the administrator "knew or should have known"
was misleading, <u>Buffonge v. Prudential Ins. Co. of Am.</u>, 426
F.3d 20, 30 (1st Cir. 2005).  <u>See</u> <u>also</u> <u>Conrad v. Reliance
Std. Life Ins. Co.</u>, 292 F. Supp. 2d 233, 238 (D. Mass. 2003)
(finding that the defendant's decision was arbitrary where
it relied on reports that had a "palpable bias in favor of
rejecting the claim").  Like claims of inadequate notice,

claims of violations of ERISA's "full and fair review" provision also require a showing of prejudice.  <u>DiGregorio v. Hartford Comprehensive Emp. Ben. Serv. Co.</u>, 423 F.3d 6, 16 (1st Cir. 2005).

Plaintiff first argues that the two-sentence denial does not comport with the ERISA notice requirement.  First, he argues that the committee did not provide any reasoning behind its finding that Plaintiff had resigned or why he did not fall within the "good reason" provision of the Plan. Second, the denial referred to § 2.10, an inapplicable provision of the Plan, which related to a "disqualifying event" when an executive is involuntarily terminated. Third, the notice failed to inform Plaintiff of his right to bring a civil action and, instead, represented that the committee's decision was final.

Plaintiff next argues that the presentation of evidence to the plan administrator was incomplete and, thus, the substantive decision cannot be upheld.  Specifically, Plaintiff asserts that the timeline prepared by Hackett was one-sided and inaccurate and that several important documents were withheld from the Compensation Committee.

Those documents were the HR form with the code "retired-involuntary" on it, the Duquette email, and the emails between Plaintiff and Kendall discussing the financial planning calculations based on a February 1, as well as a March 1, date.

Plaintiff may have identified some shortcomings, such as the lack of notice of a right to appeal or the reference to an inapplicable section of the Plan, in Defendants' benefits decision review process. However, he is unable to show how those imperfections prejudiced the decision. Terry, 145 F.3d at 39 (upholding the plan's decision in part because the plaintiff could not point to facts showing that the procedural defects "abridged his right to a full and fair" appeal to the administrator). In fact, the evidence in the record leads to the opposite conclusion: that despite any procedural irregularities, Plaintiff adroitly navigated the Plan's appeals process, even if he did not get the result he desired. Defendants provided Plaintiff with access to the vast majority of documents he requested. Moreover, Plaintiff was permitted to submit his own information to the administrator. His 70-page appeal

plainly demonstrated that he had a "sufficiently clear understanding of the administrator's position to permit effective review." Id.

Furthermore, there was nothing improper about having Crane & Co. management present its case to the plan administrators.  See Estate of Schwing v. The Lilly Health Plan, 562 F.3d 522, 527 (3d Cir. 2009) ("There is no requirement that an ERISA administrator faced with an issue of who is to be believed must conduct an independent investigation into the veracity of each account."); McCarthy, 831 F. Supp. 2d at 486 ("[N]either the ERISA statute nor the [the plan] requires an investigation by the administrator."); see also Cusson, 592 F.3d at 225 (finding nothing wrong with the defendant's reliance on a report by a full-time employee).  Indeed, the Plan documents themselves permit this approach.  (Plan 8, § 6.01 ("It shall be the duty of the Plan Administrator, on the basis of information supplied to it by the Employer, to determine the eligibility of each Terminated Employee to participate in the Plan. . . .").)  Even assuming there were some degree of prejudice to Plaintiff in the first denial of benefits as a result of an

allegedly one-sided fact presentation, Plaintiff's 70-page appeals document countered those concerns. Plaintiff was able to offer his own version, point-by-point, of every entry on the timeline and to put before the committee any emails he felt had been unfairly withheld during the initial decision process. See Terry, 145 F.3d at 35 (stating that the focus of the court's inquiry is "on the determinations of the final decision-maker").

Here, other than Defendants' decision to credit DeFalco's version of events over his own, Plaintiff can point to little else in the record evincing bias in the investigation. The appeals process protected against potential bias on the part of Hackett by allowing Plaintiff to present his unfiltered perspective to the Compensation Committee. Though he disagrees with the reasoning behind Defendants' decision, Plaintiff knew the precise basis for their denial: they concluded he retired.

Although Plaintiff relies heavily on McCarthy v. Commerce Group, Inc., that case is easily distinguishable. 831 F. Supp. 2d 459 (D. Mass. 2011) (Saris, J.). As in this case, the plaintiff in McCarthy was an executive who sought

a severance benefit.  Her claim, however, was turned down by the plan administrator because it determined she did not meet the definition of "good cause" in tendering her resignation.  After a trial, the court found that the plan administrator's decision to deny severance was arbitrary and capricious based on the presence of conflicts of interest and several prejudicial procedural flaws.  Specifically, the court found that the defendant's procedures were inadequate because the plan administrator gave no specific reasons for the denial, had no mechanism for the plaintiff to supplement the administrative record or for the plan administrator to consider new information, and provided no access for the plaintiff to documents relevant to her claim.  <u>Id.</u> at 483-84.

Furthermore, the presence of two conflicts prejudiced the plaintiff's right to a fair and complete process.  First, evidence showed that the structural conflict biased the administrator's decision: it was greatly concerned that paying severance to the plaintiff would set a precedent and expose the company to over $100 million in liability to other executives.  Second, the court found the investigation

into the plaintiff's claims was "designed not to find the truth but to assemble facts that [would] support a denial of benefits." Id. at 486. These factors together led the court to conclude that the defendant's decision was arbitrary and capricious. Id. at 489 & 491.

Unlike McCarthy, Plaintiff here cannot muster any significant evidence in the record to overcome the deferential standard of review the court must apply in examining Defendants' decision. As discussed earlier, while there existed a structural conflict of interest, no evidence permits an inference that the administrator's decision was affected by it. Also, there is no evidence of actual bias. Critically, Plaintiff cannot establish that any "procedural defects made a difference in the substantive quality" of Defendants' analysis. Id. at 491. Plaintiff's own competent and vigorous appeal demonstrated that he understood the basis of Defendants' denial, that he had access to documents relevant to his claim, that he had a chance to supplement the record with more information, and that the plan administrator was able to consider new information -- all factors lacking in McCarthy.

Based on the evidence, the court cannot conclude that Plaintiff was prejudiced in any "relevant sense" by the alleged procedural flaws in Defendants' benefits decision process. See DiGregorio, 423 F.3d at 16. Plaintiff was able to provide an informed response to Defendants' initial benefits denial, as well as meaningfully participate in Defendants' appeals process. Id. at 17. In the end, he just got a decision he did not like. Accordingly, the court finds that the alleged procedural flaws provide no basis to disrupt Defendants' benefits determination.

### 4. Substantive Flaws

Under the arbitrary and capricious standard, the court must uphold a defendant's benefits determination where it is "plausible in light of the record as a whole, or, put another way, [where] the decision is supported by substantial evidence in the record." Leahy v. Raytheon Co., 315 F.3d 11, 17 (1st Cir. 2002) (internal citations omitted). In other words, the court's duty is to examine the plan administrator's decision with a deferential eye, Hannington, 711 F.3d at 230, and ascertain whether it is reasoned and supported by substantial evidence, Colby, 705

F.3d at 62.  Evidence is considered substantial if it is

"reasonably sufficient to support a conclusion."  <u>Cusson</u>,

592 F.3d at 230.  It must be emphasized, at the risk of

repetition, that the existence of contrary evidence does not

make a plan administrator's decision unreasonable where

there is also substantial evidence supporting the original

decision.  <u>Id.</u>

Plaintiff attacks the conclusions reached by Defendants

that he retired, arguing that the procedural defects make

the substantive decision unreasonable and that the

conclusion is not supported by substantial evidence.[12]

Plaintiff argues that the evidence shows that he was

---

[12] Plaintiff also accuses Defendants of attempting to add to
the administrative record.  Where a plan administrator
relies in litigation on reasons for its denial of benefits
that are different from the reasons articulated to the
plaintiff during the administrative process, a court may,
among other possibilities, hold the plan to "the basis that
it articulated in its internal claims review process."
<u>Glista v. Unum Life Ins. Co. of Am.</u>, 378 F.3d 113, 132 (1st
Cir. 2004).  Specifically, Plaintiff challenges Defendants'
reference to Plaintiff's cancellation of travel plans for
December 5, 2011, and the email to Plaintiff's daughter.  He
claims that neither of these facts were presented to the
committee and were, thus, not a part of the decision
process.  To avoid unnecessary complications, the court has
simply ignored this additional material in reaching its
conclusion and has included it only as background.

terminated by DeFalco on December 16.  He further argues

that all the evidence shows that Defendants, and not

Plaintiff, selected Plaintiff's end date, which shows that

his termination was involuntary.  Moreover, Plaintiff

contends that Defendants' finding that he intended to resign

was unreasonable.  Finally, with respect to the evidence

Defendants rely upon -- DeFalco's account of their phone

conversation, e-mails confirming a retirement, the time span

before retracting the retirement, and Plaintiff's decision

not to ask for reinstatement -- Plaintiff says that DeFalco

misunderstood the conversation, the e-mails were

misinterpreted, and Plaintiff believed he was being fired.

Plaintiff's arguments are unavailing.  Though he

presents a possibly plausible <u>alternate</u> interpretation of

the evidence, he cannot overcome the fact that the evidence

in the record also provides substantial support for

Defendants' determination that Plaintiff announced his

retirement to DeFalco in that December 5 phone call.  The

Compensation Committee had DeFalco's account of the call;

they had the emails between Plaintiff and HR planning his

retirement date and pension calculations, as well his emails

with colleagues about his impending departure.

Additionally, they considered the fact that Plaintiff waited almost two weeks before "recanting" his retirement and the further fact that, despite his knowledge that DeFalco believed he had retired, Plaintiff never formally or informally asked for his job back. Defendants were also entitled to draw the inference that Plaintiff decided to re-characterize his retirement as involuntary -- recasting himself from "retiring" to "being retired" -- solely as an attempt to access the severance benefit.

Plaintiff places great emphasis on the fact that DeFalco -- and not Plaintiff -- determined that December 16 would be Plaintiff's last day at work. He argues that this decision by a third party rather than by the retiree was against tradition, as demonstrated by Tim Crane's retirement. Furthermore, Plaintiff argues that DeFalco's selection of the end date, by the very terms of the Plan, makes Plaintiff a terminated employee. (Plan 4, § 2.26 (defining "terminated employee" as one who experiences a "termination date").) According to Plaintiff, that fact demonstrates conclusively that he was terminated.

Unfortunately for Plaintiff, the retirement date decision is not as determinative as he would hope. It is undisputed that, though December 16 marked the last day Plaintiff went to work, he continued on the payroll until the end of February, two months later. Thus, the waters that Plaintiff insists are clear are, in reality, far murkier. Given the different, reasonable inferences that can be drawn from this fact, it is the plan administrator's responsibility, not the court's, to weigh the conflicting evidence and reach a decision. Cf. Bekiroglu v. Paul Revere Life Ins. Co., 223 F. Supp. 2d 361, 365-66 (D. Mass. 2002).

The record simply does not permit the court to find Defendants' decision to be an abuse of discretion or arbitrary or capricious. See Cusson, 592 F.3d at 228-29. Instead, the court finds that Defendants' denial of severance benefits is well supported by the substantial evidence that was before them. In reaching this determination, the court has taken into account all of the factors raised by Plaintiff, the conflicts of interest, the procedural irregularities, as well as the contrary evidence in the record. Nonetheless, applying the arbitrary and

capricious standard, Defendants' decision must be found to be supported by substantial evidence.

B.    Count Two - Interference with Rights

Section 510 of ERISA makes it unlawful to discharge a participant "for exercising any right to which he is entitled under the provisions of an employee benefit plan." 29 U.S.C. § 1140.  "The ultimate inquiry in a section 510 case is whether the employment action was taken with the specific intent of interfering with the employee's ERISA benefits."  Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995).  To survive summary judgment, a plaintiff must "make a plausible showing of specific intent," that is to say there must be evidence that the adverse employment action was taken with the specific intent of depriving or interfering with the plaintiff's ERISA benefits.  Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 67 (1st Cir. 2008).  This showing is important, otherwise "every terminated employee who exercised his or her right to benefits would, ipso facto, have a potential retaliation claim against the employer."  Id. at 66-67.

Where there is no direct evidence, a plaintiff may rely on the familiar McDonnell Douglas burden-shifting framework to establish specific intent. Id. at 67. Accordingly, a plaintiff must first establish his prima facie case and show that he "(1) is entitled to ERISA's protection, (2) was qualified for the position, and (3) was discharged under circumstances that give rise to an inference of discrimination." Barbour, 63 F.3d at 38. Then, the burden of production shifts to the defendant to provide a legitimate and nondiscriminatory basis for the adverse employment action. Kouvchinov, 537 F.3d at 67. If the defendant meets this burden of production, the plaintiff must then show that the reason offered by the defendant is a pretext for discrimination. Id. Importantly, in evaluating a charge of pretext, the mindset of the decisionmaker is the focus. "[I]t is not enough for a plaintiff to show that the decisionmaker acted on an incorrect perception. Instead, the plaintiff must show that the decisionmaker did not believe in the accuracy of the reason given for the adverse employment action." Id. (internal citation omitted).

Plaintiff asserts that he was entitled to ERISA protection because he was an executive eligible for the severance benefit, he was qualified for his position, and he suffered an adverse employment action when Defendants supposedly fired him. Accordingly, Plaintiff states that the McDonnell Douglas paradigm applies, and it is now Defendants' burden of production to provide a legitimate, non-discriminatory reason for terminating Plaintiff.

The court must conclude, however, that Plaintiff fails to surmount the first hurdle: he cannot establish a prima facie case because, for the reasons set forth above, Defendants never undertook an "adverse employment" action against him. The plan administrator reasonably determined that it was Plaintiff who left his employment when he took retirement. As discussed earlier, the record fully supports Defendants' determination that Plaintiff retired.

Even without relying on the plan administrator's good faith belief that Plaintiff retired, there is still insufficient evidence to establish an adverse employment action. Plaintiff acknowledged himself that Defendants reasonably believed that he had resigned during the December

5 cell-phone call: in his appeal to the plan administrator, Plaintiff wrote, "[T]he Company's temporary belief that I wished to resign was based on a misunderstanding. . . ." (Appeal 2 (CRA 046).)  Though Plaintiff claims that, from his perspective, he "cleared up the understanding," the record is devoid of evidence that this occurred. Furthermore, the record does not support Plaintiff's claim that he was fired on December 5 or, for that matter, on December 16, as he continued to receive paychecks from Defendants for almost two full months after his alleged firing.

It might be thought that, because there is some evidence suggesting that Plaintiff did not "retire" but was "retired," he is entitled to jury consideration of this dispute with regard to Count Two.  But Rule 56 cannot be used in this way to create an end run around the "substantial evidence" rule in an ERISA case. Because Defendants' determination that he retired, and was <u>not</u> involuntarily terminated, was supported by substantial evidence, he cannot claim that he suffered an adverse employment action sufficient to support a claim under

Section 510 of ERISA.  Any other conclusion would turn the "substantial evidence" standard applied in ERISA cases into the much more plaintiff-friendly Rule 56 standard, which the law very emphatically does not permit.

Because Plaintiff cannot establish that he suffered an adverse employment action, he cannot establish a _prima_ _facie_ case of retaliation.  Thus, the court will grant Defendants' motion for summary judgment on Count Two.

### IV.  CONCLUSION

For the foregoing reasons, the court hereby ALLOWS Defendants' Motion for Summary Judgment (Dkt. No. 32) and DENIES Plaintiff's Motion for Summary Judgment (Dkt. No. 43). The clerk shall enter judgment for Defendants.  This case may now be closed.

It is So Ordered.


/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge